UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESSALYN MARCUS,

                              Plaintiff,

        v.

JANET YELLEN, Secretary,
U.S. Department of the Treasury, *et al.*,

                              Defendants.

Civil Action No. 09-1686 (EGS)

**MEMORANDUM OPINION**

Jessalyn Marcus ("Plaintiff") is a former employee of the Bureau of Engraving and Printing ("BEP"), a component of the United States Department of the Treasury ("Treasury"). She alleges that defendant violated Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), *see* 42 U.S.C. § 2000e-16, when it (1) discriminated against her because of her race and sex; (2) retaliated against her for having engaged in protected activity; (3) subjected her to disparate treatment; (4) subjected her to a hostile work environment and a retaliatory hostile work environment; and (5) constructively discharged her.[1]

---

[1]   The Court previously dismissed Plaintiff's claim under the District of Columbia Human Rights Act ("DCHRA"), *see* D.C. Code § 2-1401.01 *et seq.*, against the federal government on the ground that sovereign immunity bars it, *see Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011), without mentioning DCHRA claims against Robinson, Fager, Carper and Olijar. Plaintiff now moves for partial summary judgment on her retaliation claims under DCHRA against these defendants in their individual capacities. *See* Pl.'s Partial MSJ (ECF No. 143) at 20, 45. Where, as here, Plaintiff relies on the same facts to support both Title VII and non-Title VII claims, Title VII preempts the DCHRA claims. *See Coulibaly v. Pompeo*, 318 F. Supp. 3d 176, 185 (D.D.C. 2018); *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 130 (D.D.C. 2016); *Bergbauer*

This matter is before the Court on Defendants' Motion for Summary Judgment (ECF No. 140) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 143).[2] For the reasons discussed below, the Court grants the former and denies the latter.

## I.  BACKGROUND

### A. Office of Currency Standards, Mutilated Currency Division

BEP "design[s] and manufacture[s] high quality security documents[.]"  Defs.' Am. Answer to Pl.'s Compl. (ECF No. 49) ¶ 2.  Gregory D. Carper ("Carper") was the BEP's Chief Financial Officer ("CFO") from 1997 until his retirement in 2005.  Mem. of P. & A. in Support of Defs.' Mot. for Summ. J. (ECF No. 140-1, "Def.'s Mem."), Ex. 18 (ECF No. 140-19, "Carper Decl.") ¶ 1.  Leonard R. Olijar ("Olijar") succeeded Carper as CFO.  *See id.*, Ex. 2 (ECF No. 140-3, "Olijar Decl.") ¶¶ 1, 3.  Catherine Fager ("Fager"), then the Chief of the BEP's Office of Currency Standards ("OCS"), reported to the CFO.  *See id.*, Ex. 6. (ECF No. 140-7, "Robinson Dep.") at 15:18-20.  Lorraine E. Robinson ("Robinson"), who became Plaintiff's first-line supervisor, was the Manager of OCS's Mutilated Currency Division ("MCD"), and she reported

---

*v. Mabus*, 810 F. Supp. 2d 251, 258 (D.D.C. 2011); *see also Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976) (stating that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment").  Remaining, then, are Plaintiff's Title VII claims which properly proceed only against the Secretary of the Treasury.  *See* 42 U.S.C. § 2000e-16(c).  Pursuant to Federal Rule of Civil Procedure 25(d), Janet Yellen, the current Secretary of the Treasury, is substituted as a party defendant.  Lorraine Robinson, Gregory Carper, Catherine Fager and Leonard Olijar will be dismissed as party defendants.

[2]  Plaintiff also "seek[s] to preclude [Treasury] from asserting an *Ellerth/Faragher* affirmative defense to avoid vicarious liability[.]"  Pl. Partial MSJ at 20.  Defendant has not raised an *Ellerth/Faragher* defense, *see* Def.'s Reply at 10, and Plaintiff's motion is moot.

to Fager.  Robinson Dep. at 15:21-16:11.  Fager and Robinson since have retired.  *See id.* at 14:12-15, 16:1-17:3.

MCD staff include Mutilated Currency Examiners (GS-05 to GS-08) and Mutilated Currency Specialists (GS-09 and GS-11).  *See* Def.'s Mem., Ex. 3 (ECF No. 140-4, "Robinson Decl.") ¶ 18.  There is no GS-10 position, *see* Robinson Decl. ¶ 18, and the GS-11 position "is competitive and may only be filled if a vacancy occurs," Pl.'s Statement of Material Facts As To Which There Is No Genuine Dispute (ECF No. 143-1, "Pl.'s SMF") ¶ 22; *see* Defs.' Responses to Pl.'s Statement of Material Facts As To Which There Is No Genuine Issue (ECF No. 159-5, "Def. Resp. SMF") ¶ 30.

BEP and the United States Postal Service "entered into a five year agreement" by the end of which BEP no longer printed postage stamps.  Defs.' Statement of Material Facts As To Which There Is No Genuine Issue (ECF No. 140-23, "Def.'s SMF") ¶ 31; Pl.'s Opp'n to Def.s' Statement of Material Facts As To Which There Is No Genuine Issue (ECF No. 142-1, "Pl. Resp. SMF") ¶ 31.  Once BEP ceased production of postage stamps, its major remaining program was the manufacture of currency for the Board of Governors of the Federal Reserve System ("Fed"). *See* Def.'s SMF ¶ 36; Pl. Resp. SMF ¶ 36.

As the postage stamp program wound down, revenue generated from printing stamps diminished drastically, *see* Def.'s SMF ¶¶ 33, 35, as did the need for manufacturing and administrative personnel associated with the postage stamp program, *see id.* ¶ 34.  Defendant represented that BEP was forced to reorganize and implement hiring controls, *id.* ¶ 37, and "focused on training and reassigning displaced postage stamp program employees," *id.* ¶ 40, in an effort to work within BEP's declining budget and to avoid a reduction-in-force of postage

stamp program employees, *see id.* ¶¶ 37-40.  For example, BEP cross-trained and selected "from within BEP for several [M]utilated [C]urrency [E]xaminer positions."  Olijar Decl. ¶ 5; *see id.* ¶ 7.  Further, BEP was sensitive to the Fed's concern that it would be forced to absorb costs related to the postage stamp program.  Def.'s SMF ¶ 39.  According to Plaintiff, BEP continued to issue vacancy announcements, *see* Pl. Resp. SMF ¶ 37, detail employees, *see id.* ¶ 40, and fill positions with personnel who were not displaced stamp program employees, *see id*.

### B. Plaintiff's Employment as a Mutilated Currency Examiner

#### 1. Plaintiff's Tenure at BEP's Washington, D.C. Facility

Plaintiff, an African American female, began her employment at BEP on January 12, 2002, as an entry-level GS-05 Mutilated Currency Examiner.  Def.'s SMF ¶¶ 1-2; Pl. Resp. SMF ¶¶ 1-2; Pl.'s SMF ¶¶ 20-21; Def. Resp. SMF ¶¶ 20-21.  A Mutilated Currency Examiner's duties "included identifying and restructuring damaged currency, and determining values of the damaged money for reimbursement."  Def.'s SMF ¶ 3; *see* Pl. Resp. SMF ¶ 3; Pl.'s SMF ¶ 23; Def. Resp. SMF ¶ 23.  Mutilated Currency Examiners "are covered by a Collective Bargaining Agreement [CBA] with the National Treasury Employee[s] Union, Local Chapter 201."  Pl.'s SMF ¶ 22.

Mutilated currency cases are assigned a grade based on the severity of the damage and the expected difficulty in processing the case.  *See* Def.'s SMF ¶ 4; Pl. Resp. SMF ¶ 4.  A Level 1 case "would be a very simple case, just a little torn or worn note, maybe three or four notes, maybe less than ten.  Level 2 would be . . . more money, but probably not in such bad shape."  Robinson Dep. at 165:1-6.  A Level 5 case is the most difficult, *see id.* at 165:8, and might involve currency that had been burned, buried, or chewed by an animal, *see id*. at 165:9-14.

4

Plaintiff was trained "to separate, sort, segregate, identify and reconstruct mutilated currency," Robinson Decl. ¶ 18, and initially worked on the least difficult (Level 1 and Level 2) cases, *see id.*, with the assistance of a senior Mutilated Currency Specialist who provided on-the-job training on the proper methods for processing cases, *see* Def.'s SMF ¶¶ 5-6; Pl. Resp. SMF ¶¶ 5-6.  Plaintiff received similar training when she was promoted to GS-06 in 2003 and began processing Level 3 cases in addition to Level 1 and Level 2 cases.  *See* Def.'s SMF ¶ 7; Pl. Resp. SMF ¶ 7.  After Plaintiff's promotion to GS-07 in 2004, she began to process Level 4 cases, *see* Def.'s SMF ¶ 8, and received similar on-the-job training from January through July 2004, *see* Pl. Resp. SMF ¶ 8.

A Mutilated Currency Specialist would be able to handle all case levels, but mainly was assigned Level 4 and Level 5 cases.  Pl.'s SMF ¶¶ 30, 80; Def. Resp. SMF ¶¶ 30, 80.  Once Plaintiff began to process Level 5 cases, a senior Mutilated Currency Specialist was available "to work with her and answer any questions she may have [had] when she began processing" these most difficult cases.  Def.'s SMF ¶ 9; *see* Pl. Resp. SMF ¶ 9.

### 2. Plaintiff's Transfer to BEP's Western Currency Facility

In late 2003, Carper "determined that adding a mutilated currency exhibit to the [BEP's] Western Currency Facility ['WCF'] in [Fort Worth,] Texas would better serve the public and increase interest in the facility's visitor's tour."  Def.'s SMF ¶ 21; *see* Pl. Resp. SMF ¶ 21.  A department meeting was held in December 2003, and its attendees included Mutilated Currency Examiners, Mutilated Currency Specialists, and managers Carper, Olijar, and Robinson.  Def.'s SMF ¶ 22; Pl. Resp. SMF ¶ 22; Pl.'s SMF ¶ 27; Def. Resp. SMF ¶ 27.

The "managers announced that they were seeking a [M]utilated [C]urrency [S]pecialist to relocate to [WCF] to participate in the . . . tour."  Def.'s SMF ¶ 22; *see* Pl. Resp. SMF ¶ 22. "The meeting was primarily for [GS-11 Mutilated Currency Specialists] since, due to security concerns," Level 4 and Level 5 cases would be sent there for processing.  Pl.'s SMF ¶ 28 (emphasis removed); Def. Resp. SMF ¶ 28.  The more mutilated the currency, the less vulnerable it would be during transport to and from WCF because the currency typically would not be usable.  *See* Pl.'s SMF ¶ 28; Def. Resp. SMF ¶ 28.  And the more difficult cases were thought to "be most interesting to the public."  Carper Decl. ¶ 2.

Plaintiff asked whether this opportunity was available to Mutilated Currency Examiners also.  Def.'s SMF ¶ 23; Pl. Resp. SMF ¶ 23.  Plaintiff was told that, if a "lower graded [M]utilated [C]urrency [E]xaminer . . . agreed to relocate to [WCF, she] could receive accelerated training, if needed, concerning processing of higher graded cases."  Def.'s SMF ¶ 24; *see* Carper Decl. ¶ 2.  According to Plaintiff, she was told that a lower graded Examiner "would receive accelerated training to ensure [she] could properly process the Level 4/5 cases and a promotion to the [GS-11 Mutilated Currency Specialist] position (receiving a grade increase every 6 months) for completing the higher-grade cases."  Pl. Resp. SMF ¶ 24 (emphasis in original).  Plaintiff submitted the statements of three co-workers to corroborate her assertion that assurances of accelerated promotion to GS-11 were made at the December 2003 meeting.  *See generally* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. (ECF No. 142, "Pl.'s Opp'n"), Ex. 2 (ECF No. 144-2).

Another Mutilated Currency Examiner asked whether the "employee agreeing to relocate could return to the Washington, D.C. facility if . . . she was not happy in Texas, and management

explained that [she] could only return to Washington, D.C. if a position was open and available." Def.'s SMF ¶ 25; Pl. Resp. SMF ¶ 25; Pl.'s SMF ¶ 32; Def. Resp. SMF ¶ 32.

Any employee interested in the position was "permitted to go on a rotation to [WCF] before making a final decision."  Def.'s SMF ¶ 26; Pl. Resp. SMF ¶ 26.  Plaintiff volunteered to travel to WCF, Def.'s SMF ¶¶ 10, 27; Pl. Resp. SMF ¶¶ 10, 27, and did so in April, May and June 2004 at BEP's expense, Robinson Decl. ¶ 9; *see* Def.'s Mem., Ex. 14.

In August 2004, Plaintiff "agreed to relocate permanently to Texas."  Def.'s SMF ¶ 27; Pl. Resp. SMF ¶ 27.  BEP covered her moving expenses.  Def.'s SMF ¶¶ 28-29; Pl. Resp. SMF ¶¶ 28-29.  On July 19, 2004, Plaintiff signed a service agreement stating in relevant part:

> In consideration for payment by the Government for travel, transportation, . . . and/or other expenses of relocating myself and my immediate family to the change of official station within the Continental United States from Washington DC to my official station in Fort Worth, Texas, I Jessalyn L. Marcus, agree to remain in the employ of the United States Government for a period of not less than twelve months after the date (August 9, 2004) on which I report for duty in Fort Worth, Texas . . . .

> If I violate this agreement by resigning or otherwise separating from the service of the United States Government without authority . . . before the end of the twelve-month period, I will repay the United States Government a sum of money equivalent to that reimbursed to me or extended on my behalf . . . .

Pl.'s Opp'n, Ex. 42 (ECF No. 144-42) at 1[3] (emphasis removed); *see* Def.'s SMF ¶ 30; Pl. Resp. SMF ¶¶ 27, 30.  Plaintiff had several complaints about her new official station, and she left Texas "one year and a few days after she relocated."  Def.'s SMF ¶ 60.

---

[3]  Unless specified otherwise, all page numbers are those designated by CM/ECF.

a. Case Load and Compensation

According to defendant, Plaintiff's case load increased each year "as she became more senior, but dropped significantly once she relocated to Texas in August 2004." Def.'s SMF ¶ 14; *see id*. ¶¶ 15-16. Plaintiff stated that "the number of cases she received correlated with the difficulty of the level of cases she received." Pl. Resp. SMF ¶ 14. The composition of Plaintiff's case load did change after she relocated to WCF: she had not been required to process mostly Level 4 and Level 5 cases prior to her transfer, Pl.'s SMF ¶ 76; Def. Resp. SMF ¶ 76, and cases sent to her at WCF "involve[d] many of the more severely mutilated, or higher graded cases," Def.'s SMF ¶ 24. "Plaintiff processed about 4-5 high level cases [per] week, which was similar to the caseload of each [GS-11 Mutilated Currency Specialist] while on rotation to [WCF]." Pl.'s SMF ¶ 41; Def. Resp. SMF ¶ 41. She also processed some Level 3 cases. Pl. Resp. SMF ¶ 43; Def. Resp. SMF ¶ 40.

According to Plaintiff, her "increased and additional job duties were significantly different and unique" compared to those of a Mutilated Currency Examiner at the Washington, D.C. facility. Pl. Resp. SMF ¶ 18. No other GS-07, GS-08 or GS-09 Examiner "was required to process mainly Level 4/5 cases," Pl. Resp. SMF ¶ 18, yet Plaintiff not only processed Level 4 and Level 5 cases, but also interacted with visitors on the public tour, Pl.'s SMF ¶ 39; Def. Resp. SMF ¶ 39, "by . . . giving small speeches and answering questions, and conducting interviews with various media sources," Def.'s SMF ¶ 18 (internal quotation marks and parentheses omitted); *see* Pl.'s SMF ¶ 39; Def. Resp. SMF ¶ 39.

Plaintiff's salary decreased upon her relocation to WCF.  Pl.'s SMF ¶ 38.  Defendant attributed the difference to "the cost of living adjustment for Texas [being] lower than that of Washington, D.C."  Def. Resp. SMF ¶ 38.

### b. Promotion to GS-08 Mutilated Currency Examiner

Plaintiff believed that she would be promoted to a higher grade level at six-month intervals after transfer to WCF.  Def.'s SMF ¶ 41; Pl. Resp. SMF ¶ 41.  Roughly six months after Plaintiff had been promoted from GS-06 to GS-07, Robinson requested a promotion for Plaintiff from GS-07 to GS-08.  Def.'s SMF ¶ 42; Pl. Resp. SMF ¶ 42; Pl.'s SMF ¶ 43; Def. Resp. SMF ¶ 43.  She also provided Plaintiff a salary verification letter presuming that Plaintiff's salary would increase with a promotion effective September 1, 2004.  Pl.'s SMF ¶ 33; Def. Resp. SMF ¶ 33.  The promotion was denied "as a violation of 5 C.F.R. § 300.604, which requires an employee to serve one year, time-in-grade, before being promoted to the next grade level."  Def.'s SMF ¶ 43.  "When Plaintiff did not receive the . . . promotion, she contacted . . . Robinson on September 21, 2004, and . . . Robinson told her that she . . . would have to wait until March or April 2005 to receive her [GS-08]."  Pl.'s SMF ¶ 44; *see* Def. Resp. SMF ¶ 44.

On October 5, 2004, Plaintiff contacted an EEO counselor, Paula Rathers ("Rathers").  Pl.'s SMF ¶ 47; Def.'s SMF ¶ 47.  She "alleged race and gender discrimination . . . for failing to have union representation at the initial 2003 department meeting . . . and for the [BEP's] failure to promote her within a month of relocating to Texas."  Def.'s SMF ¶ 44; *see* Pl. Resp. SMF ¶ 44.  Plaintiff informed Robinson by email on October 6, 2004, that she had contacted Rathers.  Pl.'s SMF ¶ 48; Def. Resp. SMF ¶ 48.  Plaintiff did not pursue a formal EEO complaint at that

time.  She was promoted to a GS-08 Mutilated Currency Examiner in April 2005, after having

served one year as a GS-07.  Def.'s SMF ¶ 44.

### c. Supervision and Verification of Plaintiff's Work

The parties dispute whether Plaintiff remained an employee of the Washington, D.C.

facility.  Plaintiff, who had no on-site supervisor at WCF, Pl.'s SMF ¶ 54; Def. Resp. SMF ¶ 54,

insists that she remained "a DC employee," Pl.'s SMF ¶ 37.  Her work assignments and supplies

originated in Washington, D.C., managers there conducted performance evaluations and were

responsible for Plaintiff's training, and payroll functions were handled in Washington, D.C.,

while "[t]ime and attendance and short leave requests were handled at [WCF]."  Def. Resp. SMF

¶ 37.

Defendant represents that the position Plaintiff encumbered transferred permanently to

WCF.  Def. Resp. SMF ¶ 37.  Robinson explained:

> The Full Time Equivalent (FTE) Mutilated Currency Examiner . . .
> position that [plaintiff] occupied at the [WCF] was permanently
> transferred to the WCF to establish a new Mutilated Currency
> Examiner position for the mutilated currency exhibit, which [was]
> part of the public tour.  Thus, [Plaintiff] did not have a position as a
> Mutilated Currency Examiner at the [Washington, DC facility].  Her
> position was at the WCF and she remained the incumbent of that
> position until the [BEP] received her letter of resignation on April
> 11, 2006.

Robinson Decl. ¶ 17.  Whether or not the FTE transferred, as of August 2004, Plaintiff's duty

station was WCF, not Washington, D.C.  *See, e.g.*, Robinson Decl. ¶¶ 27-28; Pl.'s Opp'n, Ex.

(ECF No. 144, Walsh Dep.) at 12:13-14, 12:22-13:1.

10

A Redemption of Mutilated Currency Custody and Control Manual provided that "[a]n independent verification shall be performed on all redeemable notes[.]  This process is also referred to as 'Committee.'"  Pl.'s Mot. for Partial Summ. J. (ECF No. 143, "Pl.'s Partial MSJ"), Ex. 22 (ECF No. 145-22) at 5; *see* Def. Resp. SMF ¶¶ 62-63.  Although there was no one at WCF to verify Plaintiff's work, Pl.'s SMF ¶ 54; Def. Resp. SMF ¶ 54, "compensating controls were in place," Robinson Decl. ¶ 14.  WCF's Assistant Chief Financial Officer, for example, "maintain[ed] proper control over the mutilated currency cases as they were transported from the mailroom to [Plaintiff's] desk and from her desk to the mailroom when a case was completed and ready for shipment to the Washington, DC facility."  *Id.*  Cases "were locked in a safe near [Plaintiff's] desk" when Plaintiff was not working on them, and Plaintiff "was under full camera coverage at all times."  *Id.*

At the Washington, D.C. facility, a photograph was taken of "any case which at the outset appears to be suspicious, very short or one [which] might be questioned or contested."  Pl.'s Partial MSJ, Ex. 21 (ECF No. 145-21) at 1.  Level 4 and Level 5 cases typically were "photographed to document what the case looked like when it was received," because these "cases . . . are by nature extremely difficult and/or badly deteriorated."  *Id.*, Ex. 21 at 1.  Photographs were to "remain with the case letter."  *Id.*, Ex. 21 at 2.  Plaintiff represented that Robinson directed all photos of cases assigned to her be sent to Robinson directly.  *See* Pl.'s SMF ¶ 59.

On December 9, 2004, "[P]laintiff became aware that . . . Robinson had informed Gloria Spriggs, the Union President[,] that Plaintiff['s] work was slipping."  Pl.'s SMF ¶ 50; *see* Def. Resp. SMF ¶ 50.  Nevertheless, Robinson rated Plaintiff's performance "Exceeded Standards" overall for the period from October 1, 2004 to September 30, 2005.  Def. Resp. SMF ¶ 50.  This

was so even though Plaintiff had been assigned more Level 4 and Level 5 cases in December

2004 and January 2005.  *See* Pl.'s SMF ¶ 52.  Plaintiff was among those BEP employees who

received an award of $4,000 from the Fiscal Year 2004 Goal Sharing Program, and was the sole

BEP employee to receive an award from the Fiscal Year 2005 Goal Sharing Program.  *See*

Robinson Decl. ¶ 13.

### d. Training

Even after Plaintiff's relocation to the WCF, a senior person was available to assist her

with Level 5 cases.  *See* Def.'s Mem., Ex. 1 (ECF No. 140-2, "Marcus Dep.") at 80:18-81:11,

87:4-9.  Mutilated Currency Specialists came to WCF on a rotating basis and could assist

Plaintiff with Level 5 cases.  *See* Def.'s SMF ¶¶ 12-13; Pl.'s SMF ¶ 42; Def. Resp. SMF ¶ 42.

According to Plaintiff, she received no training from December 2004 through early March 2005,

*see* Pl. Resp. SMF ¶ 13, presumably because Specialist rotations ended in November 2004, *see*

Def.'s Mem., Ex. 14.

"Plaintiff was . . . informed that . . . [she] could return any cases back to the Washington,

D.C. facility that she had difficulty processing."  Def.'s SMF ¶ 20; Pl. Resp. SMF ¶ 20; *see* Def.

Resp. SMF ¶ 66.  Plaintiff did return five cases, unprocessed, in early 2005.  Def. Resp. SMF ¶

66; *see* Pl.'s SMF ¶ 66; *see also* Pl.'s Partial MSJ, Ex. 23 (ECF No. 145-23).

In March 2005, Robinson and Roscoe Ferguson, a GS-11 Mutilated Currency Specialist,

travelled to WCF for the purpose of providing Plaintiff additional training.  Def.'s SMF ¶ 12; *see*

Pl. Resp. SMF ¶ 12; Pl.'s SMF ¶ 70.  The on-the-job training Plaintiff had received at the

Washington, D.C. facility, with senior personnel training, assisting, and checking her work, was

similar to the training Robinson and Ferguson provided at WCF.  *See* Def.'s SMF ¶ 13; *see*

*generally* Marcus Dep. at 78:2-87:9.  Plaintiff, however, deemed the March 2005 training "error-filled, inadequate and insufficient for duties" she was expected to perform.  Pl. Resp. SMF ¶ 12.  Plaintiff complained to Robinson that Ferguson "was making errors" and "moving very quickly" without "instructing [her] on how to do the work."  Marcus Dep. at 82:14-16.  After Robinson "informed . . . Ferguson that he needed to give . . . more details with respect to the processing of more difficult cases," Marcus Dep. at 84:13-16, Ferguson did so, *see id.* at 84:17.

On March 21, 2005, Robinson presented Plaintiff with a Mutilated Currency Examiner's Training Checklist.  *See* Def.'s Mem., Ex. 17 (ECF No. 140-18); Marcus Dep. at 84:22-24.  Among other items, the checklist called for Plaintiff's confirmation that she had "[t]he knowledge and ability to properly complete all level[s] of cases, which includes level 4[] and some level 5[] cases (because the lack of some types of equipment in Texas)."  Def.'s Mem., Ex. 17.  Plaintiff refused to sign the checklist, and below Ferguson's and Robinson's signatures appeared a handwritten statement, "Did not want to sign and this may hold up you [sic] next grade."  *Id.*  On that same date, there was an instruction that Plaintiff's career promotion be delayed because "Robinson would like to hold off on this action at this time."  Pl.'s Opp'n, Ex. 5 (ECF No. 144-5).  But Plaintiff testified that there was no delay in her promotion.  Marcus Dep. at 85:8-21.  After having spent one year, time-in-grade, as a GS-07, in April 2005, Plaintiff "was promoted to [GS-08] Mutilated Currency Examiner . . . as a career ladder promotion[.]"  Pl. Resp. SMF ¶ 44; *see* Def.'s SMF ¶ 44.

C. Union Grievance

The National Treasury Employees Union ("NTEU") filed a grievance on Plaintiff's behalf on November 29, 2004, *see* Pl.'s SMF ¶ 49; Def. Resp. SMF ¶ 49, complaining that

defendant had not honored promises allegedly made by Carper at the December 2003 meeting of

"Accelerated Training Program," promotions at six-month intervals, and "promotional pay" for

work on Level 4 and Level 5 cases after Plaintiff's transfer to WCF, *see* Pl.'s Opp'n, Ex. 10

(ECF No. 144-10) at 7-8.  Plaintiff demanded "an immediate promotion to [GS-08] with

retroactive pay back to August 2004 [and a] promotion to the [GS-09] within six months after

being immediately promoted," or in the alternative, relocation "back to her prior position in

Washington, DC at [BEP's] expense." *Id.*, Ex. 10 at 8.

> Robinson responded on February 16, 2005, explaining:

> > Under OPM rules and regulations, an employee must have fifty-two
> > (52) weeks, one year, in grade in order to qualify for the next highest
> > grade level.  Consequently, [Plaintiff] is only eligible for the grade
> > GS-08 after she completes the fifty-two (52) weeks at the lower
> > grade.  Her fifty-two (52) weeks at her present grade will not be
> > completed until April 4, 2005.  An attempt was made on August 8,
> > 2004 to promote [Plaintiff] to the higher grade level but was rejected
> > by personnel for the reason stated above.  This fifty-two (52) week
> > requirement will apply for each grade in the Mutilated Currency
> > Examiner series up to the GS-11 (Mutilated Currency Specialist)
> > which is a competitive grade and can only be given when a vacancy
> > is available.

Def.'s Mem., Ex. 4 (ECF No. 140-5) at 2; Pl.'s Partial MSJ, Ex. 24 (ECF No. 145-24).

Regarding Plaintiff's return to the Washington, D.C. facility, Robinson explained:

> > [Plaintiff] will not be allowed to return to the D.C. facility because
> > she voluntarily relocated to the Ft. Worth facility at [BEP's] expense
> > and her position and FTE was also transferred there.  Furthermore,
> > since [BEP] paid for her relocation, she is required to remain in her
> > position in Ft. Worth for one year.  If she takes another position
> > outside of the Agency, she will be required to reimburse [BEP].  The
> > only way [Plaintiff] will be allowed to return to the D.C. Facility is
> > if her position and/or the public tour in Ft. Worth are eliminated.

Def.'s Mem., Ex. 4 at 3.

On February 28, 2005, NTEU pursued Plaintiff's grievance to the second step, arguing that Plaintiff was performing higher level work without having received accelerated training and "promotional pay for performing the higher grade cases." Pl.'s Partial MSJ, Ex. 29 (ECF No. 145-29) at 1. Again the demand was for "an immediate promotion to [GS-08] with retroactive back pay to August 2004, [and] promotion to the [GS-09] within six months after being immediately promoted," or alternatively, Plaintiff's reassignment to her prior position in Washington. *Id.*, Ex. 29 at 2.

On April 19, 2005, Fager denied Plaintiff's second step grievance, stating that "there [was] a misunderstanding concerning the opportunities to relocate employees below the GS-11 level to [WCF]." *Id.*, Ex. 30 (ECF No. 145-30) at 1. Further, Fager explained:

> Contrary to [Plaintiff's] understanding, the phrase "accelerated training program" does not and could not mean that employees would receive a promotion every six months. Per Office of Personnel Management (OPM) regulations, codified at 5 C.F.R. § 300.604, the employee is required to serve a minimum of 52-weeks in grade. Thus, a promotion every six months is contrary to the regulation stated above.

> Only the most difficult cases will be shipped to Ft. Worth as part of the newly established public tour. Therefore, "accelerated training" may have been necessary for the lower grade examiners volunteering to relocate.

> In addition, [Plaintiff] also alleges that she is being required to perform higher grade work but without adequate compensation. At the time [Plaintiff] expressed interest in relocating to Ft. Worth, she was a [GS-06] Mutilated Currency Examiner. In March 2004, [Plaintiff] was promoted to a [GS-07] Mutilated Currency Examiner. Per Performance Standards for Fiscal Year 2004, [GS-07] Mutilated Currency Examiners are required to examine all cases, mainly level 4 and 5s. At the end of Fiscal Year 2004, [Plaintiff] received an outstanding evaluation for doing these cases.

*Id.*, Ex. 30 at 1-2.  Fager advised that Plaintiff could pursue the matter further by submitting a grievance within seven workdays to Olijar.  *Id.* at 2.  "The union did not advance the grievance for [Plaintiff] to the third step."  Pl.'s Partial MSJ, Ex. 58 (ECF No. 145-58, "Spriggs Decl.") ¶ 5.

### D. Plaintiff's Efforts to Return to BEP's Washington, D.C. Facility

Plaintiff's father became seriously ill in the spring of 2005.  Pl. Resp. SMF ¶ 45; *see* Def.'s SMF ¶ 45; Pl.'s SMF ¶¶ 81, 84; Def. Resp. SMF ¶¶ 81, 84.  He lived in or near Washington, D.C., and Plaintiff wanted to return to the Washington area so that she could care for him.  *See* Def.'s SMF ¶ 46; Pl. Resp. SMF ¶ 46; *see also* Pl.'s Partial MSJ, Ex. 38 (ECF No. 145-38).  Plaintiff contacted Rathers on July 7, 2005, regarding the Employee Assistance Program, *see* Am. Compl. (ECF No. 32) at 41, and on July 11, 2005, for help in securing a temporary or permanent detail to the Washington, D.C. facility, *see* Pl.'s Partial MSJ at 35; Am. Answer ¶ 31.[4]

#### 1. Hardship Transfer or Detail

By July 15, 2005, Fager, Olijar and Carper were aware that Plaintiff was "applying for hardship back to D.C."  Pl.'s SMF ¶ 83; *see* Def. Resp. SMF ¶ 83; *see* Pl.'s Partial MSJ, Ex. 37 (ECF No. 145-37).  Plaintiff first sought a temporary detail.  *See* Def.'s SMF ¶ 46.  According to Plaintiff, there were four to six vacant Mutilated Currency Examiner positions at that time, and

---

[4]  Rathers was the contact person for both EEO and Employee Assistance Program matters.  *See* Pl.'s Partial MSJ, Ex. 72 (ECF No. 145-72, Rathers Decl.) at 1; *see id.*, Ex. 73 (ECF No. 145-73, Rathers Dep.) at 16:4-10.  Plaintiff did not file an EEO complaint when she contacted Rathers in July 2005.

she could have filled one temporarily.  *See* Pl. Resp. SMF ¶ 47.  Plaintiff had been advised prior

to transfer to WCF, however, "that the ability to return to Washington, D.C. . . . would depend on

available positions," at a time when BEP was phasing out the postage stamp program.  Def.'s

SMF ¶ 47.  Plaintiff disputed whether there were vacancies at the Washington, D.C. facility at

that time, but conceded she knew that return to the Washington, D.C. facility depended on the

availability of an open position.  *See* Pl. Resp. SMF ¶ 47.  Robinson denied Plaintiff's request for

a temporary detail.  Pl.'s SMF ¶ 85; Def. Resp. SMF ¶ 85.  She testified that Plaintiff could not

be assigned to a position at the Washington, D.C. facility because, "as far as [she knew], there

was no position to be reassigned to."  Robinson Dep. at 105:19-20.

     Plaintiff unsuccessfully sought a detail either elsewhere within BEP or to Main Treasury.

She was advised that any detail "would need to be to a comparable position with similar

functions (which was unlikely given the specialized nature of mutilated currency examiners'

work)[.]"  Def.'s SMF ¶ 48.  Otherwise a detail "would violate particular regulations as an

augmentation of . . . Treasury's appropriations unless the detail was reimbursed by . . .

Treasury."  *Id.* ¶ 49.

     Defendants represented Olijar informed Plaintiff that, if she found a detail where

Treasury would reimburse BEP, or "one that would benefit [BEP] and [Treasury] in a

comparable position, such an arrangement would be supported."  *Id.* ¶ 50.  Plaintiff denied

having been told of the "comparable position with similar functions" requirement.  Pl. Resp.

SMF ¶ 48; *see id.* ¶ 49.  Rather, according to Plaintiff, a detail could have been arranged for a

hardship transfer if BEP simply recruited for the position and if the detailee signed appropriate

documents.  Pl. Resp. SMF ¶ 48.

Plaintiff allegedly "secured a detail in [BEP's] Stamp Department" which "was rescinded once someone from the Stamp Department spoke with . . . Olijar." Def.'s SMF ¶ 51. Olijar stated that he would not have approved such a detail because the stamp program was winding down and BEP was trying to "find alternative placements for several stamp program employees[.]" *Id.* ¶ 52.

Next, Plaintiff sought a hardship transfer to BEP's Washington, D.C. facility based on a backlog of work after Hurricane Katrina. *See* Pl.'s SMF ¶¶ 90-92, 95; Def. Resp. SMF ¶¶ 90-91. Plaintiff asserted that Robinson could have assigned someone within OCS to address this backlog of cases, Pl.'s SMF ¶ 92; Def. Resp. SMF ¶ 92, yet Robinson made no attempt to find Plaintiff a position, Pl.'s SMF ¶ 96; Def. Resp. SMF ¶ 96. However, according to Plaintiff, other BEP employees were allowed hardship transfers or reassignments. For example, a Black male mechanical examiner was allowed to transfer to the Washington, D.C. facility after it was determined that there was a vacant position for him to take. Pl.'s Partial MSJ, Ex. 44 (ECF No. 145-44) ¶ 5. A Black female employee returned to Washington for 30 days due to deaths in her family, and returned to WCF when that term expired. *Id.* And when a Black male printing plant employee sought a return to Washington and a White male printing plant employee wanted to return to WCF, these employees "were essentially allowed to swap facility locations." *Id.*

### 2. Applications for Positions at the Washington, D.C. Facility

#### a. Claims Control Technician Positions

Plaintiff applied for positions within OCS in the fall of 2005, and was not selected for any. *See* Pl.'s SMF ¶ 99; Def. Resp. SMF ¶ 99. She applied for, and on October 25, 2005, was deemed qualified for, a GS-05 Claims Control Technician position. *See* Pl.'s SMF ¶ 114. BEP

18

did not fill the position, *see* Def. Resp. SMF ¶ 114, and cancelled the vacancy on or about November 17, 2005, Pl.'s SMF ¶ 115; *see* Def. Resp. SMF ¶ 115.

Plaintiff also applied and was the sole applicant found qualified for a GS-06 Claims Control Technician position.  Pl.'s SMF ¶ 117; Def. Resp. SMF ¶ 117.  This vacancy announcement, too, was cancelled.  Pl.'s SMF ¶ 118; Def. Resp. SMF ¶ 118.

### b. GS-11 Mutilated Currency Specialist Position

In September 2005, Plaintiff applied for a position as a GS-11 Mutilated Currency Specialist.  Def.'s SMF ¶ 53; Pl. Resp. SMF ¶ 53.  One qualification was that the applicant "have at least 52 weeks of specialized experience at the next lower grade level (GS-9)[.]"  Def.'s SMF ¶ 54.  At that time, Plaintiff had served five months as a GS-08 Mutilated Currency Examiner, Def.'s SMF ¶ 55, and therefore did not meet the time-in-grade qualification, Def.'s SMF ¶ 57; Pl. Resp. SMF ¶ 57.  The selectee, a White female, Pl. Resp. SMF ¶ 55; Pl.'s SMF ¶ 103, "had served a year and four months at the [GS-09] level," Def.'s SMF ¶ 56, and had been detailed as an Accounting Technician in 2004, Pl.'s SMF ¶ 105; *see* Def. Resp. SMF ¶ 105.  Plaintiff opined that her experience with processing Level 4 and Level 5 cases at WCF should have counted as "specialized experience" which the selectee lacked.  Pl. Resp. SMF ¶ 54; *see id.* ¶¶ 56-57.  Further, Plaintiff claimed that defendants could have detailed her to the then-vacant GS-11 position, yet failed to do so.  *See* Pl. Resp. SMF ¶¶ 54, 57.

### 3. FMLA and Leave Without Pay

Because of her father's illness, Plaintiff availed herself of the Family Medical Leave Act ("FMLA").  She provided Robinson information about her father's medical condition on June

20, 2005 and July 15, 2005, Pl.'s SMF ¶¶ 81, 84; Def. Resp. SMF ¶¶ 81, 84, and Robinson

granted Plaintiff's initial FMLA request in July 2005, Def.'s SMF ¶ 58; Pl. Resp. SMF ¶ 58; *see*

Pl.'s SMF ¶ 85; Def. Resp. SMF ¶ 85, and subsequently granted several extensions, *see* Def.'s

SMF ¶¶ 59, 61; Pl. Resp. SMF ¶¶ 59, 61.

In August 2005, Plaintiff left Texas and returned to the Washington, D.C. area.  Def.'s

SMF ¶ 60; Pl. Resp. SMF ¶ 60.  Plaintiff did so for the purpose of caring for her father and "with

the understanding that she would not receive any compensation . . . while on FMLA."  Pl. Resp.

SMF ¶ 60.  Plaintiff did not renew the lease on the apartment she rented in Texas, and she

enrolled her daughter in high school in Maryland for the 2005-06 school year.  *See* Def.'s SMF ¶

60; Pl. Resp. SMF ¶ 60; Marcus Dep. at 213-215:12.

In anticipation of FMLA's expiration, Robinson sent Plaintiff a memorandum on October

14, 2005, directing Plaintiff to return to WCF on October 24, 2005.  *See* Robinson Decl. ¶ 27.

Plaintiff responded in writing on October 18, 2005, declaring she "would not be returning to

Texas[.]"  Pl.'s Opp'n, Ex. 31 (ECF No. 144-31) (emphasis removed).  In addition, Plaintiff

requested a permanent reassignment to the Washington, D.C. facility or, alternatively, leave

without pay ("LWOP").  *See id.*  Robinson granted the request for additional unpaid leave.

Robinson Decl. ¶ 28.  After FMLA leave expired on October 20, 2005, *see* Robinson Decl. ¶ 27,

Plaintiff was placed on LWOP status, *see* Def.'s SMF ¶ 61; Pl. Resp. SMF ¶ 61; *see* Pl.'s Opp'n,

Ex. 32 (ECF No. 144-32).  Plaintiff remained on unpaid leave, combined FMLA and LWOP, for

roughly 8 ½ months.  Pl. Resp. SMF ¶ 61.

"[A]s a condition of the extension of leave Plaintiff was expected to return to her duty

station" at WCF.  Def.'s SMF ¶ 62; Pl. Resp. SMF ¶ 62; *see* Marcus Dep. at 213:5-8.  Plaintiff

notified Robinson verbally and in writing that she would not return to WCF.  *See* Marcus Dep. at

207:23-208:1; 208:25-209:7; 211:23-212:25; Pl.'s Opp'n, Ex. 31 (ECF No. 144-31).

E. Plaintiff's Resignation

By memorandum "[o]n March 6, 2006, Robinson notified Plaintiff that her leave would

no longer be extended and that she was to report to her duty station within two weeks."  Def.'s

SMF ¶ 63; Pl. Resp. SMF ¶ 63.  Robinson explained:

> Regarding your request for an extended leave of absence [under the Collective Bargaining Agreement,] this is not an absolute right[.] Leave[s] of Absence[] may only be granted if the employee is expected to return to duty at the completion of the absence.  You have stated verbally and in writing that you will not be returning to [WCF] regardless of your having voluntarily relocated, and accepted a position as the only Mutilated Currency Examiner at the Fort Worth facility . . . .
>
> [Y]ou have continued to request details, reassignments, and permanent reassignments specifically to the Office of Currency Standards in Washington, D.C.  I, as well as other management officials, have met with you and your union representative Ms. Gloria Spriggs, to explain to you that there are no vacant positions in the Office of Currency Standards.  In fact, the FTE for the Mutilated Currency Examiner, the position that you currently encumber, was transferred to Fort Worth when you agreed to accept the position.
>
> [BEP] is no longer able to accommodate your absences.  From the medical documentation you have submitted, it appears that your father's condition is progressive and recovery time is indefinite. While I am sympathetic to your hardship, I cannot afford to continue granting LWOP for extended periods of time at the expense of maintaining an unoccupied position and the cost that will incur from rotating other Mutilated Currency Examiners to travel and work on the WCF tour in Fort Worth during your absences.  This is not economically feasible for the agency; it places a burden on other employees who may also have legitimate hardship issues.
>
> The kick off for the tour season at the WCF Tour and Visitor Center begins in March.  You were hired as the first permanent Mutilated

> Currency Examiner completing cases at the currency redemption
> exhibit on the tour, which is the first exhibit available for viewing
> by the public.  You are the incumbent in that position, but you have
> been away from it for over eight months.  [BEP] can no longer spare
> you from that position.  As such, you are ordered to return to the
> Western Currency Facility, Fort Worth[,] Texas, no later than
> **March 20, 2006**.  Please be advised that if you fail to return to the
> WCF, you will not be in compliance with this order and will be
> subject to adverse action up to and including removal from the
> Federal service.

Def.'s Mem., Ex. 5 (ECF No. 140-6) at 3 (emphasis in original); *see* Def.'s SMF ¶ 64; Pl. Resp.

SMF ¶ 64.

According to Plaintiff, to return to duty did not "mean she needed to return to Texas

because she was a D.C. employee."  Pl.'s Opp'n at 189.  She testified that, "as far as returning to

duty, [her] interpretation was that [she] could return to [her] official duty," and she believed her

"official duty was D.C."  Marcus Dep. at 208:1-3.

Plaintiff did not report to WCF on March 20, 2006, and Robinson placed her on absent

without leave ("AWOL") status, Pl. Resp. SMF ¶ 65, from March 20, 2006 to April 11, 2006,

Pl.'s SMF ¶¶ 141-42; *see* Def. Resp. SMF ¶¶ 141-42.  Plaintiff sent Robinson an email on March

26, 2006, *see* Pl. Resp. SMF ¶ 143, stating in part:

> I would like to inform you that I will be appealing your decision to
> put me in an [AWOL] status as you are and have been aware that I
> am my father's designated primary care giver and he was released
> from Washington VA Medical Center (after suffering from a stroke
> on February 8, 2006) in my care on Thursday, March 23, 2006.
> Again, I think it is incredibly insensitive and reckless for
> management to expect me to immediately return to Texas during this
> hardship and under these circumstances.  I have also stated to you
> that I am NOT financially able to return to Texas right now because
> management has NOT allowed me to be temporarily detailed or
> reassigned back to the Washington, D.C. facility during this
> hardship.  ALL of my requests have been denied.  How do you

> expect me to be able to care for myself and my family while not
> working and still be able to afford to return to Texas???

Pl.'s Partial MSJ, Ex. 69 (ECF No. 145-69) at 1.

Termination was among the penalties for AWOL status.  Pl.'s SMF ¶ 144; Def. Resp.

SMF ¶ 144.  Plaintiff resigned on March 29, 2006, Def.'s SMF ¶ 65; Pl. Resp. SMF ¶ 65; Pl.'s

SMF ¶ 146; Def. Resp. SMF ¶ 146, claiming she was "forced" to do so, Pl. Resp. SMF ¶ 65.

### F. EEO Complaint, EEOC Decision, and Final Agency Decision

Plaintiff filed an EEO complaint in April 2006.   *See* Pl.'s SMF ¶ 1; Def. Resp. SMF ¶ 1;

*see also* Def.'s Combined [1] Reply Brief in Further Support of Def.'s Mot. for Summ. J. and [2]

Opp'n to Pl.'s Mot. for Summ. J. (ECF No. 158, "Def.'s Reply"), Ex. A (ECF No. 158-1, "EEO

Complaint").  More precisely, Plaintiff contacted an EEO Counselor on April 14, 2006, and sent

a formal EEO complaint by Priority Mail postmarked May 25, 2006.  *See* Def.'s Reply, Ex. B

(ECF No. 159-2, "Treasury EEO Letter") at 2.  She used a two-page preprinted form titled

"INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION WITH THE

DEPARTMENT OF THE TREASURY."  EEO Complaint at 2.  Part III of the form, titled

"Alleged Discriminatory Actions," designated a space for the complainant to describe the action

she believed was discriminatory (# 15) and the bases she believed were relied upon when the

employer took the alleged discriminatory action (# 16).  *See id.* at 3.  Plaintiff checked the box

for "Retaliation/Reprisal."  *Id.*  Attached to the form were two documents: a timeline of events,

*see id.* at 4-5, and an affidavit, *see id.* at 8-11.

According to Plaintiff, she was retaliated against and/or subjected to a hostile work

environment based on prior EEO-protected activity when:

1. In July 2004, Management reneged on its offer to place her in a program of accelerated training and promotion until she reached the grade GS-11;

2. During the period from August 2004 to March 2006, Complainant received only two days of training (March 14-15, 2005);

3. On or about September 1, 2004, Complainant's manager reneged on the promise to promote her to the grade level GS-8 by that date, telling her she would have to wait until at least April 2005 for the promotion;

4. **In October 2004, Complainant's manager falsely accused her of making numerous errors on her work**;

5. In November 2004, Complainant's request to be reassigned back to the Washington, DC facility was denied;

6. During the period December 2004 through March 2005, Complainant worked without the benefit of local supervision;

7. **On or about December 8, 2004, Complainant's manager falsely accused her of making numerous errors on her work**;

8. Beginning in January 2005, Complainant was assigned more difficult duties which should have been assigned to higher-graded employees;

9. On or about February 2, 2005, the dual control security measures that Complainant had initiated were discontinued at the direction of Management;

10. **On or about February 3, 2005, Complainant's manager falsely accused her of making numerous errors**;

11. On or about February 4, 2005, Complainant's request to receive photographs of damaged currency was denied by her manager;

12. **On March 21, 2005, Complainant's manager told her that her next grade increase might be delayed because she (Complainant) would not sign a work task checklist**;

13. In or around April 2005, Complainant received no verbal or written constructive feedback on her mid-term appraisal;

14. **On or about April 7, 2005, Complainant's manager questioned the truthfulness of her time and attendance**;

15. On June 1, 2005, Complainant's work schedule was unilaterally changed by Management;

16. On July 19, 2005, Management denied Complainant's request for a hardship transfer back to the DC facility;

17. On or about September 23, 2005, Complainant learned she had been rated as not meeting the qualifications for the position of Mutilated Currency Specialist, GS-11, advertised under Vacancy Announcement Number 2005-119-AAD;

18. On October 14, 2005, Complainant was directed to report back to her position in Ft. Worth, Texas by October 24, 2005 (upon the exhaustion of her 12-weeks of leave under the Family Medical Leave Act (FMLA));

19. On or about October 18, 2005, Complainant learned that the position for which she had applied, Claims Control Technician, advertised under Vacancy Announcement Number 2005-115-AAD, had been cancelled;

20. On or about November 14, 2005, Complainant learned that the position for which she had applied, Claims Control Technician, advertised under Vacancy Announcement Number 2005-122-AAD, had been cancelled;

21. On or about January 13, 2006, Complainant's 2005 Annual Performance Appraisal rating was unjustifiably low on two critical elements;

22. **On January 17, 2006, Complainant was directed to report back to her position in Ft. Worth, Texas by January 23, 2006**;

23. In February 2006, Complainant was denied a temporary detail to the DC facility that had been arranged for her by the Union;

24. **On March 6, 2006, Complainant was directed to report back to her position in Ft. Worth by March 20, 2006**;

25. **On or about March 21, 2006, Complainant's request to remain on Leave Without Pay (LWOP) status was denied, and she was place on Absence Without Leave (AWOL)**; and

26. **On March 29, 2006, Complainant was forced to resign (constructive discharge) from her position as Mutilated Currency Examiner, GS-303-08**.

Treasury EEO Letter at 2-4 (emphasis added); *see* Pl. Resp. SMF ¶¶ 45 (referring to items 1 and

3 of the Treasury EEO Letter), 51 (referring to items 4, 7 and 10), 63 (referring to item 9), 64

(referring to item 11), 71 (referring to items 1 and 2), 74 (referring to item 12), 112 (referring to

item 17), 145 (referring to item 25), 151 (referring to items 5, 16 and 23), 155 (referring to item

25), 161 (referring to items 22 and 24), 167 (referring to item 26).   Seventeen of these 26 items

were dismissed.

Treasury's EEO Branch Manager Martha Smith determined that items 1, 3, 5, 8 and 11

duplicated matters Plaintiff had raised in her union grievance and were covered under a CBA.

Treasury EEO Letter at 5.   Citing 29 C.F.R. § 1614.107(a)(4), Smith noted that the CBA between

Treasury and NTEU allowed members to raise discrimination claims through a negotiated

grievance procedure, and that Plaintiff's election to pursue a grievance prevented her from

raising the same claims in an EEO complaint.   Treasury EEO Letter at 4.   Therefore, Smith

dismissed items 1, 3, 5, 8 and 11.   *Id.* at 5.

Smith discussed in some detail the timeliness of certain claims and considered Plaintiff's

responses to a questionnaire sent to her for an "explanation as to why [Plaintiff] did not seek

EEO Counseling within 45 days of the incident date for a number of [her] allegations."   *Id.* at 6.

Plaintiff stated that, in addition to her initial contact with Rathers on October 5, 2004, she

contacted Rathers on July 7, 2005, for the purpose of accessing services through the Employee

Assistance Program, and again on July 11, 2005, to ask Rathers' help in securing a hardship

transfer back to Washington.   *See id.* at 7.   Not until April 14, 2006, did Plaintiff contact an EEO

Counselor again.   *See id.*

Based on materials in the Administrative File before her, Smith concluded that Plaintiff

not only had "reasonable suspicion" that she had been discriminated against, but also knowledge

of the 45-day period within which to initiate EEO contact.  *Id.*  Plaintiff did not offer a
compelling reason for her failure to raise most of her discrimination claims sooner, and therefore,
Smith found that claims occurring prior to February 28, 2006 (or more than 45 days before April
14, 2006) were untimely.  *Id.* at 8.  Smith next considered whether any of the seemingly untimely
claims (items 1-23) could proceed under a continuing violation theory as linked to the timely
claims (items 24-26).  *See id.*  Smith concluded that items 17, 19 and 20 were unrelated.  *Id.*
Because claims 1, 2, 3, 5, 6, 8, 9, 11, 13, 15-21 and 23 were discrete acts involving distinct
employment actions, each would have triggered a complainant's duty to seek counseling, and
Plaintiff's failure to do so within 45 days rendered them untimely.  *Id.*  With regard to items 19-
20, because both pertained to applications for positions BEP never filled, Smith dismissed them
for failure to state a claim and pursuant to 29 C.F.R. § 1614.107(a)(1).  *Id.* at 9.

   In short, items 1, 2, 3, 5, 6, 8, 9, 11, 13, 15, 16, 17, 18, 19, 20, 21, and 23 were
dismissed, and claims 4, 7, 10, 12, 14, 22, 24, 25, and 26 were accepted for investigation.  *Id.* at
9.  The accepted claims were renumbered as items 1-9.  *See* Def.'s Reply, Ex. D (ECF No. 159-
4, "EEOC Decision") at 13.

   Branch Manager Smith advised:

> An EEOC Administrative Judge may review this decision if a
> hearing is requested on the remainder of the complaint.  If you
> request a final decision from the agency without a hearing, the
> agency will issue a decision addressing all claims in the complaint,
> including the rationale for dismissing claims, and its finding on the
> remainder of the complaint.  This dismissal may not be appealed
> until final action is taken on the remainder of the complaint.

Treasury EEO Letter at 9.

   Plaintiff sent Smith a letter requesting reconsideration.  *See* Pl.'s Combined Reply Brief
to Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. and in Further Support of Pl.'s Mot. for Partial

Summ. J. (ECF No. 160, "Pl.'s Reply"), Ex. 12 (ECF No. 160-12).  She received a response by email from an EEO Specialist, who explained that Plaintiff could appeal Smith's partial dismissal to an Administrative Judge ("AJ") if Plaintiff requested a hearing on the remaining items.  *See* Pl.'s Reply, Ex. 13 (ECF No. 160-13) at 2.

The matter proceeded to an AJ before whom Plaintiff requested a hearing.  EEOC Decision at 12.  The AJ found that Plaintiff did not "establish that there [were] genuine issues of material fact or credibility which require[d] a hearing in this matter," and granted BEP's motion for a decision without a hearing.  *Id.* at 20.

Items 1, 2 and 3 (corresponding to items 4, 7 and 10 of the Treasury EEO Letter) pertained to accusations that Plaintiff made errors in her work.  The AJ found that, even if there were disputed facts as to Plaintiff making errors, the disputes would have been immaterial because BEP maintained an "overall positive perception of [Plaintiff's] work performance." *Id.* at 19.

Item 4 (corresponding to item 12 of the Treasury EEO Letter) pertained to Robinson's alleged threat to delay Plaintiff's promotion because Plaintiff refused to sign a training checklist. The AJ noted Plaintiff's concession that her grade increase was not delayed at all.  *Id.*

Item 5 (corresponding to item 14 of the Treasury EEO Letter) pertained to a manager's question as to the truthfulness of Plaintiff's time and attendance records.  The AJ found that, if there were any dispute regarding the truthfulness of Plaintiff's time and attendance, Plaintiff had not been charged for the error.  *See id*.

Items 6-8 (corresponding to items 22, 24 and 25 of the Treasury EEO Letter) pertained to BEP's decisions to deny extended LWOP, to place Plaintiff on AWOL status, and to order Plaintiff's return to WCF.  The AJ found that BEP proffered a legitimate, nondiscriminatory

reason for these actions, *see id*. at 19-20, that is, Plaintiff's "return to WCF was necessary for the sound operation of its business," *id.* at 19, while Plaintiff "failed to offer more than generalized assertions that [BEP] was motivated by retaliation," *id.* at 20.

Item 9 (corresponding to item 26 of the Treasury EEO Letter), pertaining to Plaintiff's constructive discharge, the AJ concluded Plaintiff did not show "it to be genuinely disputed that her decision to resign . . . in the face of her family hardship . . . stemmed from illegal retaliation on [BEP's] part." *Id.* The AJ ruled in BEP's favor and issued a decision on April 14, 2010. *See generally id.* BEP issued a Final Order on April 16, 2010. *See* Def.'s Reply, Ex. D (ECF No. 159-4) at 2-4.

G. Civil Action Number 09-1686

Proceeding *pro se*, Plaintiff filed her original complaint (ECF No. 1) on August 27, 2009, and the Court granted leave to file the first amended complaint (ECF No. 32) on November 2, 2010. On September 22, 2011, Judge Urbina issued a Memorandum and Order (ECF Nos. 41-42), *see Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011), which dismissed discrimination claims under 42 U.S.C. § 1981 and the District of Columbia Human Rights Act, tort claims, a stand-alone "pattern or practice" claim, and demand for punitive damages. On February 1, 2012, counsel filed an answer (ECF No. 49) on behalf of Treasury, BEP, and then-Secretary Timothy Geithner, Lorraine Robinson, Gregory Carper, and Leonard Olijar in their official capacities.

Based on the parties' representations at an initial scheduling conference on April 5, 2012, Judge Urbina referred the case to Magistrate Judge Facciola for settlement discussions (ECF No. 52) and entered an order (ECF No. 53) for appointment of *pro bono* counsel to represent Plaintiff

for the limited purpose of mediation.  The parties did not settle the case.  After Judge Urbina's

retirement, the Clerk of Court randomly reassigned the case on April 20, 2012.

On November 26, 2012, retained counsel entered her appearance (ECF No. 56) for

Plaintiff.  After discovery closed on November 14, 2013, Plaintiff filed a motion for partial

summary judgment (ECF No. 82) on February 23, 2014, and defendants filed a motion for

summary judgment (ECF No. 93) on March 26, 2014.  The motions had been briefed fully when

Plaintiff's counsel filed a motion (ECF No. 110) on September 17, 2014, to withdraw her

appearance.  The Court granted counsel's motion by minute order on September 22, 2014.

Based on Plaintiff's representation that the parties still were discussing settlement, the Court

stayed proceedings and referred the matter to Magistrate Judge Facciola (ECF Nos. 114-115) on

September 24, 2014.  The parties advised the Court (ECF No. 117) on October 24, 2014, that

they were unable to reach an agreement.

On September 28, 2018, the Court issued a Memorandum Opinion and Order (ECF No.

123) denying the then-pending motions without prejudice.  Notwithstanding the age of the case

and the parties' representation by counsel, there remained some question as to the actual

defendants, the capacity in which the individual defendants are sued, and the legal claims

Plaintiff was pursuing.

Upon the parties' request at a status hearing on November 6, 2018, the Court referred the

matter to Magistrate Judge Robinson for settlement discussions and issued an order (ECF No.

124) for appointment of *pro bono* counsel to represent Plaintiff for the limited purpose of

mediation.  The Court also granted leave to file Plaintiff's Supplemental Statement of Claims

(ECF No. 125, "Pl. Supp.").  Further settlement discussions did not resolve the case.

Plaintiff proposed that she file a Second Amended Complaint in order to address the deficiencies of the First Amended Complaint.  Defendants, noting the age of the case and the completion of discovery over five years earlier, proffered that a more efficient approach would be a dispositive motion addressing the claims listed in the Court's September 18, 2018, Memorandum Opinion and Order and Plaintiff's Supplemental Statement of Claims.  The Court set a schedule for dispositive motions by Minute Order on August 29, 2019.  Defendants' motion for summary judgment (ECF No. 140) and plaintiff's motion for partial summary judgment (ECF No. 143) have been briefed fully.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of some factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only

31

"material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  When considering a motion for summary judgment, the Court cannot make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in her favor.  *Liberty Lobby*, 477 U.S. at 255.  The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and she cannot rely on conclusory assertions without any factual basis in the record to create a genuine dispute, *see Ass'n of Flight Attendants - CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Nor can the non-moving party "rely upon inadmissible evidence to survive summary judgment; rather, the non-moving party must rely on evidence that would arguably be admissible at trial."  *Manuel v. Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010).

    B. Race and Sex Discrimination

    Plaintiff's opposition introduced an issue – exhaustion of administrative remedies – which defendant had not raised in the summary judgment motion.[5]  Defendant since has demonstrated that Plaintiff failed to exhaust race and sex discrimination claims because, prior to filing this lawsuit, she did not (1) raise race and sex discrimination claims in her EEO Complaint and (2) appeal the outcome of her 2004 union grievance.

---

[5]  Defendant did argue in the first dispositive motion that Plaintiff's Title VII claims were time-barred.  *See* Mem. of P. & A. in Support of Defs.' Mot. to Dismiss (ECF No. 14) at 10-13.  The Court denied that motion without prejudice when it granted Plaintiff leave to file an amended complaint.

### 1. EEO Complaint

Ordinarily, a plaintiff may bring her Title VII claim in district court only after she exhausts administrative remedies.  *See, e.g.*, *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). The "lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations."  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks and citation omitted). "Where . . . the additional discriminatory acts alleged by Plaintiff in [her] complaint were not articulated in the administrative charge, are not reasonably related to the allegations in the charge, and do not fall within the scope of any administrative investigation that can reasonably be expected to follow, [she] may not proceed with these additional claims without first exhausting the administrative process."  *Shipman v. Amtrak*, 241 F. Supp. 3d 114, 123 (D.D.C. 2017) (Magistrate Judge's Report and Recommendation), *adopted*, 241 F. Supp. 3d 114, 117 (D.D.C. 2017), *aff'd*, No. 17-5066, 2017 U.S. App. LEXIS 14065, at *1 (D.C. Cir. Aug. 1, 2017).  Exhaustion "is not a jurisdictional requirement, but is an affirmative defense that the defendant bears the burden of proving by a preponderance of the evidence."  *Tapp v. Washington Metro. Area Transit Auth.*, 283 F. Supp. 3d 1, 5 (D.D.C. 2017).

As described above, Plaintiff checked the box for "Retaliation/Reprisal" on the EEO Complaint form as the sole basis for her former employer's alleged discriminatory actions.  *See* EEO Complaint at 2.  She did not check the box next to "Race" or "Sex," and her attachments to the EEO Complaint did not describe discrimination based on race or sex.  *See generally id*.  The claim ultimately accepted for investigation was whether Plaintiff had been "retaliated against and/or subjected to a hostile work environment based on prior EEO-protected activity." Treasury EEO Letter at 2; *see* EEO Decision at 12.

Race discrimination appeared first in Plaintiff's original complaint in the guise of claims under 42 U.S.C. § 1981, and these claims corresponded to items 17, 19 and 20 in the Treasury EEO Letter regarding Plaintiff's non-selection for Claims Control Technician and Mutilated Currency Specialist positions.  *See* Compl. at 4; Pl. Supp. ¶ 10; Treasury EEO Letter at 2. Additional allegations of race discrimination appear elsewhere, *see, e.g.*, Pl. Supp. ¶¶ 1-2, 12 16, but none was investigated at the administrative level, and this Court dismissed Plaintiff's § 1981 claims long ago.  Similarly, sex discrimination crept into this lawsuit, *see, e.g.,* Am. Compl. at 6; Pl. Supp. ¶¶ 1-2, 12, even though no such claim had been presented or investigated at the administrative level.

Defendant demonstrates – and Plaintiff's own arguments and exhibits support the conclusion – that the race and sex discrimination claims had not been presented at the administrative level and therefore were not exhausted prior to bringing this lawsuit. Accordingly, the Court dismisses Plaintiff's race and gender discrimination claims.  *See, e.g., Maryland v. Sodexho, Inc.*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (where plaintiff "checked only retaliation EEOC charge as the circumstances of the alleged discrimination," and where plaintiff "discussed only . . . his belief that he 'was terminated in retaliation for filing a previous EEOC Charge of Discrimination,'" claims based on religion, harassment, hostile work environment, or any workplace behavior occurring while he was employed cannot proceed); *Hunt v. District of Columbia Dep't of Corr.*, 41 F. Supp. 2d 31, 36 (D.D.C. 1999) (dismissing gender discrimination claim where plaintiff "specifically checked the boxes for age discrimination and retaliation, but she did not check the box for gender discrimination," and where nothing "within the EEOC claim form . . . indicates that [she] was alleging gender discrimination").

34

### 2. Union Grievance

When an agency employee is "covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, if that employee "wish[es] to file a complaint or a grievance on a matter of alleged employment discrimination[, she] must elect to raise the matter under either part 1614 or the negotiated grievance procedure, but not both." 29 C.F.R. § 1614.301(a); *see* 5 U.S.C. § 1721(d).  An employee elects to proceed under a negotiated grievance procedure "by the filing of a timely written grievance."  29 C.F.R. § 1614.301(a).  If the employee opts to pursue a written grievance, she "may not thereafter file a complaint on the same matter under this part 1614 irrespective of whether the agency has informed [her] of the need to elect or of whether the grievance has raised an issue of discrimination."  *Id.*  The employee "may appeal the final decision of the agency [or] the arbitrator . . . on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised" to the EEOC.  29 C.F.R. § 1614.401(d).  Only after the EEOC's decision may the employee pursue a Title VII claim in federal court.  *See Johnson v. Peterson*, 996 F.2d 397, 401 (D.C. Cir. 1993) (affirming dismissal of discrimination claims brought by plaintiffs who failed to take claims to EEOC after arbitration under negotiated grievance procedure); *Koch v. Walter*, 934 F. Supp. 2d 261, 269 (D.D.C. 2013) ("An employee who pursues his claims under the negotiated grievance procedure . . . may reach federal court only after appealing the final decision in the grievance process to the EEOC."); *Rosell v. Wood*, 357 F. Supp. 2d 123, 128 (D.D.C. 2004) ("If an employee files a timely written grievance before filing a written EEO complaint, he has irrevocably chosen the negotiated grievance procedure, and is precluded from filing an EEO complaint on the same matter.").

The parties do not dispute that Plaintiff was a member of NTEU, that she was covered by a CBA, and that she availed herself of the union grievance procedure when, on November 29, 2004, NTEU filed a grievance on her behalf.  Defendant argues that, by opting to pursue claims pertaining to her training, promotion, compensation and case assignments following transfer to WCF, denial of her request for reassignment to the Washington, D.C. facility, and denial of access to photographs of damaged currency, Plaintiff may not pursue these claims in this lawsuit because she neither challenged the EEOC's dismissal of claims previously presented in her union grievance nor appealed the final decision on the grievance to the EEOC.  *See* Def.'s Reply at 12-14.  These claims correspond to items 1, 3, 5, 8 and 11 set forth in the Treasury EEO Letter.

Plaintiff responds that, by letter dated August 3, 2007, to Martha Smith, she sought reconsideration "for some of the dismissed claims[.]"  Pl.'s Reply at 34.  She points to two exhibits, *see generally id.*, Ex. 12, 14 (ECF Nos. 160-12, 160-14), requesting that items listed as 15, 16, 17, 19 and 20 in the Treasury EEO Letter proceed.  Neither exhibit mentions items 1, 3, 5, 8, and 11, and Plaintiff proffers no evidence that she challenged the dismissal of items 2, 6, 9, 13, 15-21 as untimely.

Plaintiff had not exhausted her administrative remedies with respect to the claims presented in her union grievance and, therefore, the Court dismisses these claims.  Remaining for resolution, then, are Plaintiff's retaliation, hostile work environment, and constructive discharge claims arising from the matters exhausted at the administrative level, corresponding to items 1, 2, 3, 4, 6, 7, 8 and 9 of the Treasury EEO Letter.[6]

---

[6]  Neither party discusses item 5 of the Treasury EEO Letter pertaining to Plaintiff's time and attendance record, and the Court will not discuss it either.

C. Retaliation

1. *McDonnell Douglas* Framework

Title VII "contains an anti-retaliation provision, barring an employer from taking an adverse action against an employee 'because [she] has opposed any practice made unlawful by [Title VII], or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII].'"  *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)) (brackets in original).  "The role of the antiretaliation provision is to prevent employer interference with unfettered access to Title VII's remedial mechanisms."  *Chambers v. District of Columbia*, 35 F. 4th 870, 877 (D.C. Cir. 2022) (citation and internal quotation marks omitted).  If a plaintiff cannot present direct evidence of an employer's violation of Title VII, the Court assesses her claims under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

A plaintiff's first task is to "prov[e] by the preponderance of the evidence a prima facie case[.]"  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  On a retaliation claim, a plaintiff "must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct."  *Walker v. Johnson*, 798 F.3d 1085, 1091-92 (D.C. Cir. 2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012)).  In the context of a retaliation claim, an action is materially adverse when "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Baird*, 792 F.3d at 168 (citation and brackets omitted).

"If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." *Jones*, 557 F.3d at 677 (citations and internal quotation marks omitted).  If the employer does so, "the burden-shifting framework disappears," and the Court considers only "whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (citation, internal quotation marks and ellipses omitted); *see Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008).  "[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (citations omitted).

### 2. Plaintiff "Making Errors"

According to Plaintiff, defendant retaliated against her when Robinson accused her of making errors in her work.  *See* Pl.'s SMF ¶ 50; Pl. Supp. ¶ 3; Marcus Dep. at 171:23-172:1.  Plaintiff testified about an alleged $10,000 error in a case assigned to her, *see* Marcus Dep. at 172:9-17, and Robinson's remark to Spriggs that her work was "slipping," *id.* at 131:20.  Little discussion is warranted on this point, given Plaintiff's failure to support her factual assertion that Robinson ever made a statement of this kind with evidence a factfinder may consider at trial.  Plaintiff had no personal knowledge of this conversation between Robinson and Spriggs, however, and merely repeats what Spriggs allegedly told her.  She cannot rely on inadmissible hearsay evidence.  Plaintiff fared no better by relying on Spriggs' deposition testimony, which at best is inconclusive, given Spriggs' inability to recall any details about her conversation with

Robinson.  *See* Spriggs Dep. at 31:6-19.  At most, Plaintiff establishes that a conversation between Robinson and Spriggs occurred during which "Robinson mentioned something about the concern of [Plaintiff's] work," Spriggs Dep. at 31:11-12, Spriggs could not recall.

Even if Robinson had commented to Spriggs about Plaintiff's work, Plaintiff fails to demonstrate that a reasonable employee in her situation would have been dissuaded from engaging in protected activity had she known Robinson would make such comments.  Here, a supervisor allegedly made remarks about the quality of a subordinate's work to a Union representative who contacted the supervisor at the subordinate's request.  Furthermore, Plaintiff fails to demonstrate that she suffered any negative consequence following Robinson's alleged comments.  Rather, the record shows that Plaintiff received her grade increase to GS-08 on schedule after having served one year as a GS-07 Mutilated Currency Examiner.  And Robinson – the very person who allegedly retaliated against Plaintiff – rated Plaintiff's performance "exceeds expectations" for the relevant reporting period.

### 3. Threat of "Delayed" Grade Increase

Plaintiff contends that defendant retaliated against her when, in March 2005, Robinson threatened to delay her promotion because she refused to sign a training checklist.  *See* Pl. Supp. ¶ 8; Marcus Dep. at 84:22-85:7.  This matter deserves little discussion either.  The connection between Plaintiff's protected activity in October 2004 and Robinson's alleged threat roughly five months later is unclear, and at any rate, Plaintiff herself testified that she was promoted on schedule notwithstanding her refusal to sign the checklist.  Marcus Dep. at 85:8-21.

### 4. LWOP and AWOL

Plaintiff's problem with LWOP is two twofold: she Plaintiff contends that defendant retaliated against her by granting her request for LWOP rather than arranging her return to the Washington, D.C. facility, and by denying an extension of LWOP to one full year pursuant to the CBA. *See, e.g.*, Pl. Supp. ¶ 12.

The record shows Plaintiff presented defendant a choice upon expiration of FMLA: grant her request for LWOP or find her a detail at the Washington, D.C. facility. The record also shows that Plaintiff justified to defendant's satisfaction her need for extended leave and, accordingly, defendant authorized LWOP from October 2005 through March 2006. The Court notes that, at the time defendant made the decision to extend LWOP, Plaintiff had a full-time position already, albeit in an undesirable location from her perspective, which she had not performed since August 2005. Even if defendant could have detailed Plaintiff to a position at the Washington, D.C. facility, Plaintiff proffers no evidence to support a position that defendant was obligated to do so.

As to the second point, defendant proffers a legitimate, nonretaliatory reason for denying LWOP for one full year: Plaintiff's need for leave appeared to be indefinite, given her father's medical condition; it was not economically feasible for BEP to send other Mutilated Currency Examiners to WCF during Plaintiff's absence; the currency redemption exhibit on the public tour was to have resumed in March 2006; and Plaintiff notified Robinson verbally and in writing that she refused to return to WCF. *See* Def.'s Mem. at 43. Defendant demonstrates that extended LWOP under the CBA could be granted only if the employee was expected to return to duty, and Plaintiff declared that she would not. And when Plaintiff failed to report to WCF on March 20,

2006, after an excused absence of 8 ½ months, defendant placed her on AWOL status.  *See*
Def.'s Mem. at 45, 75.

      Plaintiff's response is feeble at best.  First, Plaintiff denies having told Robinson that she
*never* would return to WCF, *see* Pl.'s Opp'n at 192, or that she requested leave "in perpetuity,"
*id.* at 109, instead requesting LWOP for a finite period of one year, *see id.* at 111.  Second, she
claims that BEP incurred no expenses related to the Mutilated Currency Examiner position at
WCF because she was not paid and because BEP did not send anyone to WCF for the exhibit
during her months-long absence.  *See* Pl.'s Opp'n at 111-12, 192-93.  Economic feasibility aside,
even if Plaintiff's assertions were supported, Plaintiff does not rebut defendant's proffer – which
Plaintiff's own exhibits and deposition testimony support – that, notwithstanding written
warning, Plaintiff failed to report to official duty station – WCF – when ordered to do so.

      Rather than pointing to materials in the record to rebut defendant's proffer, Plaintiff
offers excuses.  She claims to have been financially unable to return to Texas, and attributes her
predicament to defendant's refusal to offer her a transfer, detail or some other paid position at the
Washington, D.C. facility.  *See id.* at 109.  Further, Plaintiff describes her responsibility to care
for her father, *see, e.g., id.* at 110-11, which, while understandable, does not undercut
defendant's showing on summary judgment.  It is apparent from the record that Plaintiff had
been warned that LWOP would not be extended beyond March 2006, that Plaintiff declared her
refusal to return to WCF, and that Plaintiff failed to report to WCF.

### 5. Orders to Return to Work at WCF

      Plaintiff considers defendant's written directives to return to work at WCF acts of
retaliation.  *See, e.g.,* Pl. Supp. ¶ 18.  In her view, defendant forced her to choose between risking

termination as a potential penalty for AWOL status and returning to a "non-functional" position at WCF. Plaintiff considers her position at WCF "non-functional" for two reasons.

First, Plaintiff posits that the mutilated currency exhibit at WCF had ended. In support, she produces the January 3, 2006, email message from Olijar to Fager and Robinson stating:

> I have cancelled the request to recruit mutilated currency examiners for training in DC and transfer to Texas. I do not plan to pursue setting up a mutilated currency operation in Texas because I don't think that it will be cost effective. We may want to send an examiner down for the truly rare "special event."

Pl. Partial MSJ, Ex. 66 (ECF No. 145-66). Plaintiff treats this email message as proof of management's decision to "cease the operation in Texas." *Id.* at 94. Her suggestion, then, is that there was no position to which she could have returned because BEP discontinued the mutilated currency exhibit. *See* Pl.'s Opp'n at 193, 207.

Second, Plaintiff asserts that there would not have been potential for a promotion to the GS-09 grade level had she returned to WCF. *See* Pl.'s Partial MSJ at 53. She states that training lower grade level employees would be required for a promotion, and because she was the only Mutilated Currency Examiner at WCF, potential for a GS-09 position "was no longer available to [her], thus this was a dead-end, non-functional position." *Id.*; *see* Pl.'s Opp'n at 188; Pl.'s Reply at 23.

Plaintiff ignores the inconsistency between the supposed "non-functional" nature of the Mutilated Currency Examiner position at WCF and BEP's expectation and demand that she return to it. She points to no materials in the record to show that her position at WCF actually had been eliminated, or that BEP definitively cancelled the mutilated currency exhibit. Rather, based on the parties' submissions, it appears that BEP suspended the mutilated currency exhibit

because its only Examiner, Plaintiff, had taken extended leave.  Plaintiff also ignores, and fails to rebut, BEP's proffered legitimate nonretaliatory reason for ordering Plaintiff's return, that is, to staff the mutilated currency exhibit at WCF when it was to resume.

Lastly, Plaintiff maintains that she was a D.C. employee, that her commitment to WCF was limited to one year, and that she fulfilled her commitment by working at WCF from August 2004 through August 2005.  *See* Pl. Opp'n at 9, 188.  Once the requisite year had passed, Plaintiff asserts, return to duty meant return to the Washington, D.C. facility.  *See id.* at 114; Marcus Dep. at 207:23-208:3.  These assertions reflect a misunderstanding of the service agreement Plaintiff signed and her status as a "D.C. employee."

The service agreement provided that Plaintiff would have been obligated to reimburse the federal government for her moving expenses if she did not remain in Texas for one full year.  It is silent as to the term of her commitment to WCF, and Plaintiff produces no evidence that her transfer to WCF was limited to a one-year term.  If anything, the service agreement emphasizes that Plaintiff's transfer meant a transfer of official station to Fort Worth, Texas.  *See* Pl.'s Opp'n, Ex. 42 (ECF No. 144-42) at 1.  While the record supports Plaintiff's assertion that she remained a D.C. employee for administrative purposes, it also demonstrates that Plaintiff's physical workplace and official duty station was WCF, and Plaintiff fails to show otherwise.

### D. Hostile Work Environment and Retaliatory Hostile Work Environment

A hostile work environment is a "workplace . . .  permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

"In this circuit, a hostile work environment can amount to retaliation under Title VII." *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (citing *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003)). Thus, "[a] plaintiff may bring a special type of retaliation claim based on a hostile work environment by alleging a series of individual acts that may not be actionable on their own but become actionable due to their cumulative effect." *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020) (citations, internal quotation marks, and brackets omitted). The acts giving rise to a retaliatory hostile work environment claim "must be both adequately linked such that they form a coherent hostile environment claim, and of such severity or pervasiveness as to alter the conditions of employment and create an abusive working environment." *Id.* at 6 (citation, internal quotation marks and ellipses omitted).

By its nature, a hostile environment happens "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted). Although a hostile work environment claim is "based on the cumulative effect of individual acts," *id.*, "a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard," *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

"[T]he standard for severity and pervasiveness is . . . an objective one." *Gray v. Foxx*, 637 F. App'x 603, 608 (D.C. Cir. 2015) (per curiam) (quoting *Baird*, 792 F.3d at 172) (emphasis removed); *see Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). The Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 787–88 (1998)); *Harris*, 510 U.S. at 23 (providing that court consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"). While "[s]everity and pervasiveness are complementary factors and often go hand-in-hand, . . . a hostile work environment claim could be satisfied with one or the other." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (citation omitted).

Practically every incident Plaintiff identifies, from the December 2003 meeting through "forced" resignation in March 2006, is fodder for a hostile work environment claim. *See* Pl.'s Opp'n at 203-06; *see generally* Pl. Supp. According to Plaintiff, "[a]ll of these actions disadvantaged and unfairly interfered with [her] ability to do her job and resulted in a loss of an opportunity for continued employment." Pl.'s Opp'n at 206. Certain incidents she highlights, *see id.* at 204, involve another employee, not Plaintiff, and the other incidents, *see id.* at 205-06, are not so much supportive of a hostile work environment claim, as they are gripes about management decisions rendered from afar.

For example, Plaintiff deemed her training inadequate, *see* Pl. Supp. ¶¶ 7, her workload and composition of assignments inappropriate, *see id.* ¶¶ 4, and security measures inadequate, *see id.* ¶¶ 5-6, yet management did not offer training, adjust her workload, or modify security measures to Plaintiff's satisfaction. Nor did defendant select Plaintiff for a GS-11 Mutilated Currency Specialist position notwithstanding her failure to meet minimum qualifications for the position, and complained when BEP offered the position to another candidate who did. *See id.* ¶ 10. Plaintiff also complained that BEP withdrew vacancy announcements after Plaintiff applied for the positions, *see id.* ¶ 11, even though BEP cancelled the announcements and never filled

those vacancies.  And Plaintiff objected to BEP's order to return to a job she had not performed for over eight months, *see id.* ¶ 18, and placed her on AWOL status when she failed to report to WCF as directed, *see id.* ¶ 15.

Taken together, it cannot be said that Plaintiff's workplace was permeated with intimidation, ridicule and insult, and certainly not to an extent the conditions of her employment were altered.  Hostile work environment claims have failed where employees suffered far worse. *See, e.g.*, *Gray*, 637 F. App'x at 608 (concluding that plaintiff did not demonstrate hostile work environment where "only evidence . . . to support . . . claim is that [supervisor] yelled and belittled her" without "connect[ing] his remarks to any protected status"); *Taylor v. Haaland*, No. 20-CV-3173, 2022 WL 990682, at *4 (D.D.C. Mar. 31, 2022) (employee complained of (1) monitoring her arrival and departure time and using her coworkers to assist with this monitoring; (2) allowing her coworkers to taunt her; (3) limiting her lunch time to a specific hour; (4) proposing a five-day suspension without pay and later expanding the suspension to fourteen days; (5) offering her an "unconscionable" settlement agreement, which Taylor characterized as an "ultimatum to take or leave it"; (6) suspending her for twelve days; and (7) investigating her employment history); *Coady v. Chao*, No. 16-CV-2010, 2019 WL 4706908, at *6 (D.D.C. Sept. 26, 2019) (concluding that AWOL charge, accusation by supervisor that employee shouted at a coworker, and delayed reimbursement for travel expense amount to no more than "ordinary tribulations of the workplace'"), *aff'd*, No. 19-5292, 2020 WL 3409651 (D.C. Cir. June 11, 2020); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56–57 (D.D.C. 2004) (finding that employee "shut out of certain meetings, denied travel opportunities and other perks, and spoken to in a condescending manner . . . does not mean that [she] was subjected to an illegal hostile work environment"); *see also Durant v. District of Columbia Gov't*, 875 F.3d 685,

46

700 (D.C. Cir. 2017) (affirming grant of summary judgment for employer where plaintiff "failed

to substantiate his contentions with evidence that, for example, he was "routinely subjected to

isolation away from his colleagues," "continually subjected to threats to his employment [or]

admonishments," and "denied equal pay and equal access to resources").

At most, Plaintiff strings together a number of discrete actions, none of which betrays

intimidation, ridicule and insult on BEP's part, which were not to Plaintiff's liking.  But "it is

well-established that this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged

discrete acts of retaliation into a broader hostile work environment claim."  *Mason v. Geithner*,

811 F. Supp. 2d 128, 177 (D.D.C. 2011) (citation and internal quotation marks omitted), *aff'd*,

492 F. App'x 122 (D.C. Cir. 2012).  Her contentions fall in line with "the ordinary tribulations of

the workplace," *Faragher*, 524 U.S. at 788 (citation omitted), which do not rise to the level of a

hostile work environment.  A workplace is not hostile just because management declines to grant

an employee's every wish.

E. Constructive Discharge

Presumably, a resignation is voluntary.  *See Alitta v. Bair*, 614 F.43d 556, 566 (D.C. Cir.

2010).  "The constructive-discharge doctrine contemplates a situation in which an employer

discriminates against an employee to the point such that [her] 'working conditions become so

intolerable that a reasonable person in the employee's position would have felt compelled to

resign.'"  *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v.

Suders*, 542 U.S. 129, 141 (2004)); *see Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558

(D.C. Cir. 1997).  "The inquiry is objective[,]" *Suders*, 542 U.S. at 141, and a plaintiff must

show "'something more' than, say, a hostile work environment claim alone," *Robinson v. Ergo*

*Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Suders*, 542 U.S. at 147) (additional citation omitted).

Here, Plaintiff alleges constructive discharge as the consequence of defendant's alleged wrongdoing.  *See* Pl. Resp. SMF ¶ 65; Pl. Supp. ¶ 16.  In this circumstance, a constructive discharge is not a "stand alone cause[] of action."  *Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 97 (D.D.C. 2016).  Rather, "[e]stablishing that the employee was constructively discharged is one way of establishing an element of a discrimination claim, that the plaintiff suffered an adverse employment action."  *Russ v. Van Scoyoc Assocs., Inc.*, 122 F. Supp. 2d 29, 35 (D.D.C. 2000).  It pertains to a plaintiff's potential recovery, not to an employer's liability under Title VII.  *See Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 74 (D.D.C. 2006) (stating that, where "alleged constructive discharge [is] a *consequence* of the discrimination and retaliation . . . it *would* impose a limitation on certain elements of recovery," to include "[in]eligibility for back pay and benefits under Title VII [after] the date of . . . resignation") (citations omitted) (emphasis in original)).  Consequently, Plaintiff's constructive discharge claim is not actionable on its own. Even if it were, the claim still fails.

"The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination," *Kalinowski*, 435 F. Supp. 2d at 78, and Plaintiff has not produced evidence of such extreme mistreatment or threats.  "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."  *Robinson*, 85 F. Supp. 3d at 283 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)). Plaintiff could have returned to WCF or she could have remained on AWOL status with knowledge that AWOL status could lead to termination.  She chose to resign, and now cannot

48

claim constructive discharge where the record shows that BEP wanted her to remain in its employ. *See Kalinowski*, 435 F. Supp. at 80.

Plaintiff accepted an atypical position and railed against the very elements which made the position atypical. She visited WCF before she agreed to transfer there as the sole Mutilated Currency Examiner, yet blames defendant for BEP's purported failure to ensure that Plaintiff's position met all of her needs, including her need to *not* work for several months. Plaintiff had valid reasons for taking extended leave and proved to defendant's satisfaction that FMLA and LWOP were justified. Simultaneously, though, Plaintiff sought full-time employment, and faulted BEP for failing to identify or create a position for her, or to offer her a position for which she was not qualified, or otherwise provide her a paid position in the geographic location of her choice.

## III. CONCLUSION

For the reasons discussed above, Court GRANTS defendants' motion for summary judgment and DENIES Plaintiff's cross-motion. An Order is issued separately.

DATE:  August 31, 2022                    /s/
                                          EMMET G. SULLIVAN
                                          United States District Judge